IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| v. | § | Criminal Case No. **3:17-CR-70-L** |
| | § | |
| **MARCUS MAXWELL** | § | |

## MEMORANDUM OPINION AND ORDER

On February 7, 2017, former Dallas Police Officer Marcus Maxwell ("Defendant" or "Maxwell") was charged in a three-count indictment (the "Indictment") with Obstruction of Due Administration of Justice in violation of 18 U.S.C. § 1503 (Counts One and Two) and making False Statements to a Federal Agency in violation of 18 U.S.C. §1001 (Count Three). After Maxwell waived his right to a jury trial, the court conducted a bench trial from November 27, 2017, through December 1, 2017, pursuant to Federal Rule of Civil Procedure 23(c).[1] During the trial of this case, the Government produced evidence, including testimony from witnesses, recorded telephone calls and interviews, transcripts of the recordings, and text messages, to support the corruption charges against Maxwell. Maxwell did not call any witnesses to testify on his behalf at trial. After carefully considering the testimony and evidence admitted at trial, applicable law, and having assessed and weighed the testimony of each witness and all admitted evidence, the court, for the reasons herein

---

[1] On November 16, 2017, the court held a hearing on Defendant's Waiver of Jury Trial (Doc. 39), filed November 8, 2017. After questioning Defendant and his counsel and hearing argument of counsel, the court determined that Defendant's waiver was voluntary and knowing, and granted his request to waive his right to a jury trial. Order (Doc. 46).

set forth, **finds** Maxwell **guilty** as to all offenses charged in Counts One, Two, and Three of the Indictment.[2]

## I.     Factual Findings

Maxwell was a police officer with the Dallas Police Department ("DPD") from September 27, 2006, to June 3, 2016. Starting in approximately September 2012, Maxwell also operated a trucking business called Maxwell Trucking Company. In August 2015, Federal Bureau of Investigation ("FBI") Special Agent Jennifer Chapman ("Chapman") was contacted by the DPD Public Integrity Unit ("PIU") and asked to attend a meeting at DPD's office regarding an investigation known as Operation Showtime. This investigation had been ongoing for several years and focused on a large-scale cargo theft ring involving the theft of items being transported on the interstate system via truck, tractors, or semi-trailers in the Dallas-Fort Worth, Texas area, along the Interstate-20 corridor. In attendance at the meeting were members of the DPD PUI, the DPD Major Crimes Unit, and the Texas Department of Public Safety ("DPS"). Chapman was informed that the goal of Operation Showtime was to take down the cargo theft operation, and the main target of Operation Showtime was a person named Bryan Adamson ("Adamson"), also known as Showtime. Chapman was brought in to handle the "law enforcement angle" of the investigation because a DPD officer had been implicated in the criminal activity being investigated, and she was assigned to the

_____

[2] Under Rule 23(c), when "a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Defendant timely requested specific findings of fact in a written decision, which are set forth in this memorandum opinion and order in accordance with Rule 23. A majority of the court's factual findings is set forth in the "Factual Findings" section of this order but are not necessarily limited to this section and may be referenced elsewhere in the order, including the court's analysis applying the applicable law to the facts of this case. The location of the court's factual findings in this opinion has no particular significance and does not make any of the facts found by it more or less important.

FBI's public corruption unit and dealt primarily with cases involving criminal activity by law enforcement officers. The DPD officer implicated in the criminal activity was Maxwell.

### A.     Initiation of the FBI and Grand Jury Investigations

Chapman testified during the trial of this case that, after the August 2015 meeting with DPD and DPS, she opened a "full [FBI] investigation" to investigate Maxwell's and Adamson's activities in connection with the related federal grand jury investigation initiated by the United States Attorney's Office. During the course of these investigations, Chapman identified Geane Doby ("Doby"), whose street name was "Girl Watcher," as a potential cooperating individual, to assist with the investigations. Doby was identified as a potential source because he had previously worked with the DPD as an informant and knew all of the major players in the cargo-theft operation being investigated, including Adamson. Doby's reputation as a cargo thief was well known. In November 2015, Doby agreed to act as a confidential informant for the FBI and have his communications from a cellular telephone provided by the FBI recorded, including all incoming calls and text messages. The cellular telephone was activated on December 21, 2015. Doby was paid at least $5,000 for his cooperation throughout the course of the investigation. Doby also provided his personal cellular telephone to FBI agents, which showed that he had been in contact with Maxwell.

During the trial, Doby testified and admitted to having a drug addiction and extensive criminal history that included stealing cargo from trailers in the Dallas-Fort Worth area for more than a decade. There was also evidence that Doby had been released from working with the FBI and DPD in the past because of his inability to refrain from engaging in criminal activity. The court normally would find the testimony of a witness like Doby highly questionable or suspect in light of his

extensive criminal record, admitted cocaine addiction, and questionable motives for testifying; however, having observed his demeanor, and having reviewed audiotapes admitted into evidence along with testimony of other witnesses that corroborated his testimony, including that of DPD Detective David Durica; Artis Rollins ("Artis"),[3] a former associate of Maxwell; DPD Detective Gilberto Martinez; Christopher Thomas ("Thomas"); DPD Detective Chris DeLeon; DPD Detective Michael Swain; DPD Officer Derrick Deane ("DPD Officer Deane"); and Charles Matthews, a former employee of Maxwell, the court finds Doby's testimony in this case to be credible, and it has no reason to doubt the accuracy of his testimony regarding the essential facts.[4]

Doby testified that he first encountered Maxwell in April 2015 after stealing a trailer that belonged to Maxwell. Doby testified that Maxwell and Thomas confronted him at his motel room at the Royal Inn in April 2015 about stealing Maxwell's trailer. Thomas, also known as "Big Chris," worked as a driver for the Maxwell Trucking Company, which Maxwell owned and operated for a period of time while working as a DPD officer. Following this encounter, Doby, Maxwell, and Thomas left the Royal Inn to locate Maxwell's trailer, which was ultimately found a few days later. DPD Officer Deane corroborated Doby's account by testifying that he pulled over the vehicle driven by Maxwell after the trio left the Royal Inn to locate the stolen trailer.

Doby testified, and the evidence establishes, that, after the encounter with Maxwell and Thomas at the Royal Inn, he was never arrested for stealing Maxwell's trailer. Doby and Maxwell, instead, developed a friendship or business relationship of sorts involving stolen cargo and other

---

[3] The court refers to Artis Rollins by his first name because that is how he is referred to in various recorded conversations that were admitted into evidence by the Government.

[4] The court also found Chapman's testimony and the Government's other evidence, which was not rebutted or called into question by the defense, to be credible. Further, the court found no inconsistencies in the evidence or testimony that were material and related to the essential elements of any of the counts.

criminal conduct. On several occasions, Maxwell and Doby exchanged text messages in which they discussed Maxwell purchasing various types of stolen goods from Doby. On December 29, 2015, Doby met with Thomas and Maxwell at the Pilot Truck Stop, where Maxwell asked Doby to disable and make inoperable the engine of a "[r]ed red Volvo"[5] truck with an "A & T" logo on it in exchange for $500 because Artis, who operated the A & T trucking company at that time, owed Maxwell money. *See* Gov't Exs. 3; 4 at 4-5. Maxwell told Doby, "I need to get that bitch taken care of . . . Whatever you gotta do with that mother f**ker." Gov't Ex. 12 at 6. Doby confirmed the agreed upon $500 price, and Maxwell responded in the affirmative "Yea[h], yea[h], yea[h]."[6] *Id.*

The next day, Doby telephoned Thomas and told him that he went by the location where Maxwell said the A & T truck would be located, but he did not see the truck. Thomas told Doby that he had a "bad vibe" about this and suggested that Doby not do what Maxwell had asked regarding the truck. Gov't Ex. 6 at 1-2. Thomas reasoned that Maxwell was a "law man" and, if things went badly, he would turn against them to protect his job as a police officer. On Thomas's advice, Doby agreed not to "f**k" with the truck. *Id.* at 2-3.

On January 4, 2016, during a telephone call, Maxwell asked Doby about "the issue we talked about," and Doby explained that Thomas had told him not to "f**k with it so I didn't." Gov't Ex. 8 at 3. Maxwell responded, "Yeah man, I need that done though . . . he owe[s] me some money man" and confirmed that it was a red A & T truck located "off of Old Hickory." *Id.* at 3-4. In

---

[5] It is apparent from the recording of this conversation that Maxwell used the description "[r]ed, red Volvo" for emphasis to explain to Doby that the Volvo was bright or scarlet red in color.

[6] There is a slight discrepancy between the transcript of this recorded conversation, Government's Exhibit 12, and the actual recording, which was admitted as a separate exhibit. Maxwell's response was transcribed as "Yea, yea, yea," but the tape recording indicates that his response was actually, "Yeah, yeah, yeah." The tape recording, therefore, controls.

passing, Doby mentioned toward the end of the conversation with Maxwell that he was no longer

on parole, so he could "do a whole bunch of stealing now." *Id.* at 6. Doby testified regarding both

of these telephone conversations with Thomas and Maxwell and stated that Maxwell "never came

back and told me not to mess with [the red Volvo truck]."

Doby and Chapman also both testified that, on January 8, 2016, Maxwell had a conversation

with Doby about purchasing stolen electronics, and the Government introduced evidence of this

conversation, which was recorded. During the conversation, Maxwell specifically asked Doby to

get him some CB radios and a Rand McNally global positioning device or "GPS." Gov't Ex. 14 at

6-7, 8. Doby told Maxwell that he "had been stealing from trucks for almost twenty five[-] years"

and indicated that, if Maxwell needed it, he could get him anything, including the "NASA spaceship

. . . if the price is right." *Id.* at 15-17. Doby and Maxwell also joked about Doby being the "CEO"

of the lucrative company "Spot and Steal," after which Maxwell said to Doby, in all seriousness, "I

need that for real." *Id.* at 15-16. Doby testified that he had no other means of obtaining the items

requested by Maxwell other than stealing them. Doby was comfortable talking to Maxwell about

his chosen profession as a thief and was not worried about Maxwell arresting him because Maxwell

had bought stolen items from him before.

On January 12, 2016, Doby telephoned Maxwell to let him know he had the electronic items

requested and boasted, "I steal this shit everyday." Gov't Ex. 26 at 2-3. A short time later, Maxwell

met Doby by a Waffle House restaurant near a 7-Eleven store and purchased the stolen electronic

devices requested at a reduced price, including one Rand McNally GPS and one "Cobra" brand CB

radio for $100. Gov't Exs. 51; 30 at 3-8, 12-13. Doby testified that he brought two CB radios to sell

to Maxwell, but he only sold one of the CB radios because Maxwell was not willing to pay the price

Doby was asking for both of the CB radios. In the recorded exchange that took place during the meeting, Doby referred to Maxwell as cheap—"the brokest, dirtiest cop I ever seen"—to which Maxwell blamed "hard times," and Doby said he was a "hard time lying nigga." *Id.* at 7-8. Doby testified that stolen goods were sold at a reduced price because "you can't sell stolen stuff on the street for full price." Doby told Maxwell that he had taken the "brand new" electronics from a truck, Gov't Ex. 16 at 2, but, unbeknown to Maxwell, the items he purchased from Doby were not actually stolen. They were provided to Doby by law enforcement to sell to Maxwell under the guise that they were stolen.

### B. FBI's First Meeting with Maxwell on March 18, 2016

Maxwell first became aware of the FBI's investigation sometime in February 2016 after hearing that another police officer had said that the FBI was asking about him. Gov't Ex. 42 at 16. Maxwell telephoned someone at DPD in an attempt to find out whether he was being investigated. DPD in turn informed Chapman that Maxwell had inquired about the investigation. After learning that "the cat was out of the bag," Chapman, together with FBI Special Agent Charles Richardson ("Richardson"), made the proactive decision to visit Maxwell at his home in Desoto, Texas, to conduct what Chapman referred to as a "soft interview." The purpose of the interview was to assess Maxwell's trustworthiness by asking him questions to which Chapman already knew the answers. Maxwell did not know beforehand that FBI agents were planning to visit him but was friendly when encountered outside his residence while taking out the trash, and he voluntarily agreed to answer some questions inside his home.

In the beginning of the interview, which was recorded by Chapman, Chapman explained to Maxwell that she and Richardson were FBI agents and wanted to talk to him about Thomas.

Chapman further explained that she and Richardson had been working as part of a task force for some time investigating the cargo thefts taking place in the I-20 corridor, that Thomas's name kept coming up, and they knew he had worked for Maxwell as a driver. Before delving deeper, Chapman warned Maxwell, "[I]t is a crime to lie to the FBI," Gov't Ex. 42 at 2, and advised him that their investigation was "part of a, *we* actually have a federal grand jury investigation into . . . all of this stuff regarding the cargo thefts and everything," to which Maxwell responded in the affirmative, "Right." *Id.* at 3 (emphasis added). Maxwell, nevertheless, proceeded to lie about his relationship with Doby in response to questions by Chapman and stated that he had not heard from or seen Doby since April or June of 2015, even though he had met with him as recently as January 2016 to purchase stolen electronics. *Id.* at 6, 15. Maxwell also denied knowing that Doby had been hired to steal or mess with Artis's truck. *Id.* at 7, 15. Maxwell indicated that he had heard of Showtime but denied knowing him or anything about him involving theft, which was inconsistent with his prior conversations with Doby regarding Showtime. Maxwell volunteered that he was not personally involved in the cargo thefts. *Id.* at 16 ("I hadn't been [doing] nothing like that. . . . I hadn't did nothing."). He also indicated that he did not believe that Thomas was a cargo thief but that Doby or Girl Watcher was known for that type of stealing. *Id.* at 8.

### C.    FBI's Second Meeting with Maxwell on April 15, 2016

A month after the first interview, Chapman learned that Maxwell was put on administrative leave by DPD. Shortly thereafter, Maxwell began calling Chapman frequently to inquire whether she knew why he had been placed on administrative leave. On April 15, 2016, during one of those calls, Maxwell accepted Chapman's invitation to meet with her at the FBI's Dallas, Texas office.

FBI Special Agent Andrew Walton ("Walton") also attended the April 15, 2016 meeting, which, unbeknown to Maxwell, was recorded.

During the meeting, Maxwell inquired whether Chapman knew why he had been placed on administrative leave.  Chapman responded: "Okay, . . . basically like I said when we went to your house. There's a bunch of different tentacles in this [investigation]. All out doing interviews about the cargo theft and like all those people and everything. And so essentially a lot of people are talking, and that is why you [we]re put on A time."  Gov't Ex. 44 at 2.  In addition, Chapman told Maxwell that she knew what he had previously told her was not the truth, suggested that they start over from the beginning, and reminded him again "just remember, it is a crime to lie to the FBI." *Id.* at 3. Chapman further admonished Maxwell that, if he was not going to be completely truthful this time, he should just leave because being untruthful was not going to help her or the "very large federal case" she was working on, and his lying would definitely not help him in what was coming down the road in that case.  *Id.* at 3.  In response, Maxwell asked, "*With me?*," to which Chapman responded, "*Well, you're part of the case . . . it's you amongst many other people*," including some of the persons discussed during their first meeting.  *Id.* at 4 (emphasis added).  Maxwell acknowledged that he understood by saying, "Right, okay."  *Id.*

Before continuing, Chapman again advised Maxwell that they could start over, that she thought he knew a lot of information that would be helpful to him and the situation in which he now found himself, and warned that she would tell him when she knew he was not telling the truth.  In addition, she advised him that there were different things she and Walton considered to be lying, for example, "a blatant . . . yes or no lie . . . or . . . lie by omission . . . [by] completely leaving something out" or a lie by fabricating facts and explained that she knew that some of the things he had told her

before were what she considered blatant or "basic" lies, for example, when he lied before about not seeing Girl Watcher since April or June of 2015. *Id.* at 6. Chapman went on to tell Maxwell that, given the things that had "come to light" "in this case," she felt DPD really had no choice but to put him on administrative leave. To this Maxwell responded, "Right, right. . . . okay. . . . I understand," and agreed to start from the beginning. *Id.* at 6-7.

Despite these and other repeated admonishments throughout this second meeting about the importance of his being truthful and being given the opportunity to redeem himself, Maxwell went on to deny that he ever asked Doby to steal anything for him and denied purchasing or receiving a stolen GPS, CB Radio, or anything from Doby. *Id.* at 24-26. Maxwell denied doing any business with Doby, and, when pressed about whether he had ever asked Doby to steal anything, Maxwell responded emphatically, "No, no I didn't never tell him to steal nothing for me. . . . No, no, no, no." *Id.* at 24-25. Maxwell's denials of purchasing or receiving a stolen GPS from Doby or Girl Watcher were similarly definitive:

| | |
|---|---|
| Chapman: | Do you, do you owe [Girl Watcher] money right now? |
| Maxwell: | No. |
| Chapman: | For a GPS or a CB radio? |
| Maxwell: | No. |
| Chapman: | So you paid him for that? |
| Maxwell: | No, I didn't owe Girl Watcher for anything. |
| Chapman: | You don't owe him any, okay, but he sold you a stolen GPS and a CB radio? |
| Maxwell: | No, talking about Girl Watcher? I don't have a CB [r]adio. I don't, I don't have a CB [radio]. I don't have, I don't a CB [r]adio. I don't |

|            |                                                                                                   |
| ---------- | ------------------------------------------------------------------------------------------------- |
|            | have, I don't have trucks. I gave all my trucks back to [the] Bank of DeSoto.                      |
| Chapman:   | Well now, I know, but he sold [to you] that night[,] he sold you those stolen items.              |
| Maxwell:   | No he, he, no he did not.                                                                          |
| Chapman:   | He gave them to you for free?                                                                      |
| Maxwell:   | No, I don't have a GPS.                                                                            |
| Chapman:   | Well, I know you don't now [] because you want it for yourself.                                   |
| Maxwell:   | I didn't. I never got em. I never got a GPS. I never got a CB [r]adio. He didn't give me anything. . . . I never got anything from that dude. . . . No, no, no. I'm sorry, but I don't. I can't. I can't vouch for that. . . . No ma'am. I'm sorry. |

*Id.* at 25-26. Maxwell knew that the GPS he requested and purchased from Doby was stolen because he was aware of Doby's reputation and even told Chapman during their first meeting that Doby was known for being a cargo thief and that he himself had been a victim of Doby's cargo theft in the past.

When confronted about asking Doby to disable Artis's truck, Maxwell continued to be evasive and denied that he ever talked to Doby about Artis's red Volvo A & T truck. *Id.* at 26-27. Then, after Chapman disclosed that she had a recorded telephone conversation of him asking Doby to disable Artis's red Volvo A & T truck and Doby saying he would just steal the truck, Maxwell attempted to explain away his prior recorded conversation with Doby by telling Chapman that he had a change of heart and told Doby "not to mess with that truck" and that, as far as he knew, Doby "never messed with . . . Artis'[s] truck." *Id.* at 26-35.

## II.    Analysis

### A.    Section 1503 (Counts One and Two)

The statements made by Maxwell during his voluntary meeting with FBI agents Chapman and Walton on April 15, 2016, form the bases for all three counts of the Indictment.  Regarding Counts One and Two, the Indictment alleges that, on or about April 15, 2016, in violation of 18 U.S.C. § 1503, Maxwell "knowingly and corruptly endeavor[ed] to influence, obstruct and impede the due administration of justice in a United States Grand Jury investigation in the Northern District of Texas by falsely stating" to FBI agents that he never told Doby, who is referred to in the Indictment as "Person A," to steal anything for him (Count One) and never received a global positioning system or GPS from Doby (Count Two).  Indictment ¶¶ 7, 9.

Section 1503(a), which is considered a catch-all provision, prohibits an individual from "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).[7]  To establish a violation of section 1503 for obstruction of the due administration of justice, the Government must prove beyond a reasonable doubt each of the following elements: "(1) that a judicial proceeding was pending; (2) that the defendant had knowledge of the judicial proceeding; and (3) that the defendant acted corruptly with the specific

---

[7] Section 1503(a) provides in full as follows:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice."

*United States v. Bedoy*, 827 F.3d 495, 504 (5th Cir. 2016) (internal quotation marks and citation

omitted). A grand jury investigation is considered a "pending judicial proceeding" for purposes of

section 1503. *United States v. Vesich*, 724 F.2d 451, 454 (5th Cir. 1984) (citing *United States v.*

*Howard*, 569 F.2d 1331, 1337 (5th Cir. 1978)).

The seminal case regarding a defendant's intent as it relates to section 1503 is *United States*

*v. Aguilar*, 515 U.S. 593 (1995). The Government and Defendant both cite *United States v. Bedoy*,

in which the Fifth Circuit discussed at length the Supreme Court's opinion in *Aguilar*. As explained

by *Bedoy*, *Aguilar* involved a federal district judge who was:

> under investigation for attempting to influence a federal habeas petition pending
> before another judge in his district. The habeas petition had been filed by a person
> associated with an acquaintance of Judge Aguilar. The acquaintance, Abe Chapman,
> had spoken with Judge Aguilar about the filing. After conferring with Chapman,
> Judge Aguilar talked to the district court judge handling the habeas petition. Judge
> Aguilar was also under investigation for telling Chapman that Chapman's phone had
> been wiretapped. In a subsequent interview with FBI agents, Judge Aguilar "lied
> about his participation in the [federal habeas] case and his knowledge of the wiretap."

*Bedoy*, 827 F.3d at 504-05 (citing *Aguilar*, 515 U.S. at 595-98). The Supreme Court reversed Judge

Aguilar's conviction under section 1503 based on its determination that no rational jury could

conclude he possessed the requisite intent to obstruct a grand jury proceeding because the

Government had not satisfied section 1503's "nexus requirement," that is, the requirement that a

defendant's "act must have a relationship in time, causation, or logic with the judicial proceedings."

*Bedoy*, 827 F.3d at 504 (citing *Aguilar*, 515 U.S. at 599) (citations omitted). In other words, "the

endeavor must have the natural and probable effect of interfering with the due administration of

justice," and a defendant's act "must be with an intent to influence judicial or grand jury

proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as

an investigation independent of the court's or grand jury's authority." *Bedoy*, 827 F.3d at 504 (citing *Aguilar*, 515 U.S. at 599) (internal quotation marks and citations omitted).

The Court in *Aguilar* concluded that the Government had not satisfied the nexus requirement because it did not believe that the mere uttering of false statements to an FBI agent who may or may not testify in a grand jury proceeding was sufficient to establish a violation of section 1503(a)'s catch-all provision. *Bedoy*, 827 F.3d at 505 (citing *Aguilar*, 515 U.S. at 600). In support of this determination, the *Aguilar* Court reasoned that: (1) the Government failed to establish that FBI agents "acted as an arm of the grand jury;" and (2) the transcript of an FBI interview with Aguilar did not support the Government's argument that Aguilar "understood that his false statements would be provided to the grand jury and that he made the statements with the intent to thwart the grand jury investigation and not just the FBI investigation." *Bedoy*, 827 F.3d at 505 (citing *Aguilar*, 515 U.S. at 600) (internal quotation marks omitted). In the transcript relied on by the Government in *Aguilar*, the FBI agent responded as follows to Aguilar's question of whether he was the target of a grand jury investigation: "[T]here is a Grand Jury meeting. Convening I guess that's the correct word. Um some evidence will be heard I'm . . . I'm sure on this issue." *Bedoy*, 827 F.3d at 505 (citing *Aguilar*, 515 U.S. at 597, 600) (internal quotation marks omitted). The *Aguilar* Court rejected the Government's argument that this evidence would "enable a rational trier of fact to conclude that [Aguilar] knew that his false statement would be provided to the grand jury" and concluded that the "evidence goes no further than showing that [Judge Aguilar] testified falsely to an investigating agent." *Bedoy*, 827 F.3d at 505 (citing *Aguilar*, 515 U.S. at 601).

In *Bedoy*, on the other hand, the Fifth Circuit determined that the Government established the requisite nexus between statements made by the defendant to a government witness and grand

jury proceedings, and affirmed the section 1503 conviction of a former DPD detective. *Bedoy*, 827 F.3d at 506. FBI agents in *Bedoy* were investigating allegations that a DPD detective was providing information to an FBI informant about how to avoid law enforcement investigations by DPD involving prostitution parlors and websites used to advertise prostitution. *Id.* at 499. A federal grand jury was empaneled based on these allegations. *Id.*

On appeal, Bedoy argued, based on *Aguilar*, that the Government's evidence regarding his requisite intent was insufficient to establish a section 1503(a) violation because the evidence failed to establish that he actually knew his false statements would be presented to the grand jury. *Id.* at 505. The Fifth Circuit rejected this argument because the Court in *Aguilar* "did not expressly hold that actual knowledge is a necessary element to establish the nexus requirement. Instead, the Court held that the nexus requirement only demands that the defendant believe his statements 'are *likely* to affect the judicial proceeding.'" *Id.* (citation omitted). Alternatively, Bedoy argued that the evidence was insufficient because, "to satisfy the nexus requirement, the FBI agents must have at a minimum warned him that they had been subpoenaed to testify before the grand jury." *Id.* at 506. The Government, in response, contended the evidence satisfied the nexus requirement because "Bedoy lied to the FBI agents after they informed him that (1) he was the target of a grand jury investigation, (2) those agents were directly connected to that investigation, and (3) he could be charged with obstruction for lying." *Id.*

The Fifth Circuit explained that the "the nexus requirement may be satisfied whe[n] a rational jury could find that the defendant understood that the [investigating] agents were integrally involved in th[e] grand jury investigation," and, "[c]ontrary to Bedoy's argument, proof of such involvement

does not require the FBI agents to explicitly state that they had been subpoenaed to appear before the grand jury." *Id.* (citations omitted). The Fifth Circuit clarified, however, that:

> the fact that Bedoy was told that he was the focus of a grand jury investigation—by itself—is not enough to satisfy the nexus requirement. As the dissent in *Aguilar* noted, the evidence "established that [the defendant] knew a grand jury had been convened" and "that he had been told he was a target of its investigation." 515 U.S. at 614, 115 S. Ct. 2357 (Scalia, J., dissenting).

*Id.* Based on this reasoning, the Fifth Circuit concluded that the Government had "to prove that Bedoy understood the FBI agents to whom he lied were connected to that grand jury investigation rather than acting pursuant to 'an investigation independent of . . . the grand jury's authority.'" *Id.* (citing *Aguilar*, 515 U.S. at 599).

The Fifth Circuit, nevertheless, found *Aguilar* factually distinguishable and determined that the Government satisfied the nexus requirement in *Bedoy* because, unlike *Aguilar*, FBI agents in *Bedoy* not only advised the defendant "that he was the target of the federal grand jury investigation" but also informed him that "'*we* . . . opened a grand jury investigation' after learning that 'local law enforcement may be giving' prostitutes 'information.'" *Bedoy*, 827 F.3d at 506-07 (internal quotations omitted and emphasis in original). The evidence in *Bedoy* also established that "Bedoy . . . lied *after* an FBI agent told him that the FBI had been involved in opening a grand jury investigation of which he was the target and that he could be charged with obstruction." *Id.* at 507 (emphasis). The *Bedoy* court, therefore, determined that the evidence was sufficient to establish that, when Bedoy lied to FBI agents, he "understood the FBI agents were acting as the arm of the grand jury, and that impeding the agents efforts necessarily meant obstructing the grand jury," and affirmed Bedoy's conviction under section 1503(a). *Id.* (quoting *Fassnacht*, 332 F.3d at 451) (internal quotation marks omitted).

Based on the reasoning in *Bedoy*, the court determines that the Government in this case has proved beyond a reasonable doubt the three elements necessary to establish a violation of section 1503(a). Regarding the first element, whether a judicial proceeding was pending, evidence by the Government establishes that, when Maxwell met with Chapman in March of 2016, there was a grand jury investigation that had been opened and pending since August 2015 to investigate Maxwell's and Adamson's activities involving cargo theft and corruption. Regarding the second element, whether the defendant had knowledge of the judicial proceeding, the evidence establishes that Maxwell initially learned about the FBI's investigation and that the FBI had been asking about him in February 2016. In his first meeting with Chapman in March 2016, Maxwell learned that there was not only an FBI investigation but also a grand jury investigation involving Chapman when she explained to him, "*we* actually have a federal grand jury investigation into like all of this stuff regarding the cargo thefts and everything." Gov't Ex. 42 at 2-3 (emphasis added). Maxwell may not have known for certain at this juncture whether he was a target of the FBI and grand jury investigations, but he likely suspected that he either was a target or was going to be a target of both investigations in the near future because Chapman's questions were specifically directed at Thomas's and Doby's criminal activities of which he was a participant.

Any doubts Maxwell may have had in this regard were dispelled during his next meeting with FBI agents in April 2016 when he asked and was told that he was one of the targets of the federal case and grand jury investigation. Specifically, Chapman advised Maxwell that "*lying to [her] is definitely not going to help . . . you and what's coming down the road*. I mean this is a very, very large federal case, and it—I mean tons of agencies are involved, so obviously," to which Maxwell responded, "*With me?*," to which Chapman replied, "*Well, you're part of the case*," and Maxwell

acknowledged, "*Right, ok.*" Gov't Ex. 44 at 3-4 (emphasis added). In response to Maxwell's question, "[W]hat's the indictment on?," Chapman further advised: "But you're just not. I told you. We're working all of the cargo thefts. It's everything. It's the drugs. It's the prostitutes. It's the cargo thefts." *Id.* at 35-36. Without disclosing who was going to be indicted, Chapman reminded Maxwell what she had told him during their first meeting: "I told you before, *we* have, it's a federal grand jury investigation, and so it's very secretive." *Id.* at 55 (emphasis added).

The evidence, thus, establishes that, as a result of the discussions that occurred during the March and April 2016 meetings, Maxwell was aware of the grand jury proceeding, he knew Chapman was connected to the grand jury proceeding and the cargo theft investigation, and he knew he was at least one of the targets of the grand jury investigation. In reaching this conclusion, the court also takes into account Maxwell's familiarity with the justice system because of his position as a police officer. Maxwell was also put on notice that Chapman was aware that he had lied to her in the first meeting about his involvement in the cargo thefts and other related criminal activities, and, because of information that had come to light about his involvement, she thought DPD's decision to place him on administrative leave was justified.

Regarding the last element, whether "the defendant acted corruptly with the specific intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice," the Government's evidence irrefutably establishes that, during the second meeting with FBI agents in April 2016, Maxwell lied when he denied that he ever asked Doby to steal anything for him (Count One) and stated that he never received a GPS from Doby (Count Two). As noted, the trial testimony and recorded communications between Doby, Maxwell, and Thomas demonstrate that, despite Maxwell's false protestations to the contrary, he asked Doby to obtain electronics for him and

received a GPS from Doby. Given Maxwell's knowledge of Doby's reputation as a cargo thief and his interactions with Doby, the court can reasonably infer in the absence of any evidence to the contrary, that Maxwell understood that any electronics obtained by Doby would be procured by thievery. In other words, Maxwell knew that, in asking Doby to get him a GPS, he was asking Doby to steal a GPS for him. For the same reason, Maxwell understood or believed that the GPS he received from Doby was stolen, not a gift or something obtained through a lawful transaction.

Like *Bedoy*, the evidence in this case similarly establishes that, when Maxwell made the foregoing false statements during his second meeting with Chapman, he understood that she was "integrally involved" in the pending grand jury investigation and was acting as an arm of the grand jury because she had previously told him, "*we* . . . have a federal grand jury investigation into . . . all of this stuff regarding the cargo thefts and everything." Gov't Ex. 42 at 2-3 (emphasis added). Maxwell also made the false statements after learning that he was one of the targets of the grand jury proceeding. Maxwell, nevertheless, ignored Chapman's repeated warnings about the importance of being truthful and the impact his misrepresentations could have on the grand jury proceeding and the large federal case, of which he was a part, and continued to lie about his relationship and interactions with Doby that are the focus of Counts One and Two. Further, the timing and circumstances under which Maxwell made the false statements to Chapman after learning that he was a target of the FBI and grand jury investigations lead the court to conclude that Maxwell made the false statements intentionally for the specific purpose of hindering the grand jury investigation to avoid being personally indicted and prosecuted for his involvement in the matters under investigation that were the subject of Chapman's pointed questions during the March and April 2016 meetings. Accordingly, the Government has met its burden of establishing beyond a reasonable

doubt that Maxwell is guilty of violating section 1503(a) as charged in Counts One and Two of the Indictment.

**B.    Section 1001(a) (Count Three)**

Regarding Count Three, the Indictment alleges that, on or about April 15, 2016, in violation of 18 U.S.C. § 1101, Maxwell "willfully and knowingly ma[d]e a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the executive branch of the Government of the United States" when he told FBI agents that he never told Doby, who is referenced in Count Three as "Person A," "anything about an A & T truck." Indictment 11. The Indictment further alleges that Maxwell knew the statement was false because "he had offered to pay [Doby] $500 to disable an A & T truck." *Id.*

Under section 1001(a)(2), it is unlawful, "in any matter within the jurisdiction of any department or agency of the United States [to] knowingly and willfully . . . make[] any false, fictitious or fraudulent statements or representations." To sustain a conviction for false statements under section 1001(a), the Government must prove beyond a reasonable doubt: "(1) a statement, that is (2) false, (3) and material, (4) made with the requisite specific intent, [and] (5) within the purview of government agency jurisdiction." *United States v. Najera Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010) (citations omitted). For a false statement to be material, it "must have 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)).  In determining whether a false statement was material to the decision, courts consider "what statement was made" and "what decision the agency was trying to make." *Jimenez*, 593 F.3d at 399 (quoting *Gaudin*, 515 U.S. at 509). The false statement, however, need not actually influence a government decision.

*United States v. Puente*, 982 F.2d 156, 159 (5th Cir. 1993). It is, therefore, irrelevant, for example, whether an FBI agent believed or was actually deceived by a defendant's misrepresentations. *United States v. Edwards*, 303 F.3d 606, 637 (5th Cir. 2002). In deciding whether the Government has met its burden regarding materiality, the trier of fact may consider "the inferences a 'reasonable [decisionmaker]' would draw from a given set of facts and the significance of those inferences to him [or her]." *Id.* at 512 (citations omitted). The material falsity may be a willful omission of information. *United States v. Wright*, 211 F.3d 233, 238 (5th Cir. 2000); *see also United States v. Mattox*, 689 F.2d 531, 533 (5th Cir. 1982) ("Silence may be falsity when it misleads."). The requirement under section 1001 "that the false representation be made 'knowingly and willfully' is satisfied if the defendant acts deliberately and with the knowledge that the representation is false." *United States v. Griego*, 837 F.3d 520, 523 (5th Cir. 2016) (quoting *United States v. Guzman*, 781 F.2d 428, 431 (5th Cir. 1986)). For purposes of section 1001, "jurisdiction" is defined broadly in a "nontechnical manner" to "cover[] all matters confided to the authority of an agency or department" such that the statute applies "whenever false statements would result in the perversion of the authorized functions of a federal department or agency." *United States v. Taylor*, 582 F.3d 558, 563 (5th Cir. 2009) (citations omitted).

The evidence at trial establishes that Maxwell lied to FBI agents regarding a matter within the FBI's jurisdiction. Specifically, Chapman was brought into the DPD's and DPS's interstate cargo theft investigation to handle the "law enforcement angle" of the investigation because Maxwell had been implicated in the criminal activity being investigated, and she was assigned to the FBI's public corruption unit that dealt with cases involving criminal activity by law enforcement officers like Maxwell. As a result of the FBI and grand jury investigations, Chapman discovered that Maxwell

had recruited Doby or Girl Watcher to steal stolen cargo for him, which he then purchased from Doby at a reduced rate. She also learned that Maxwell had engaged in other related criminal activity by asking Doby to disable a red Volvo A & T truck to "get back at" the owner, Artis, who owed Maxwell money. Instead of arresting or filing a criminal complaint against Doby for stealing his trailer, Maxwell used this incident as leverage over Doby for his personal financial benefit to obtain stolen cargo goods at a reduced rate.

In response to questioning during the April 2016 meeting with Chapman and Walton, however, Maxwell flatly denied ever talking to Doby regarding anything to do with an A & T truck. Gov't Ex. 44 at 26-27 ("No, no, I don't deal with Girl Watcher like that . . . I never talked to Girl Watcher anything about an A & T truck."). The recordings of Maxwell's conversations with Doby, as well as Chapman's and Doby's testimony, establish that this statement by Maxwell was demonstrably false. This statement was also material because it had "a natural tendency to influence" Chapman's and the FBI's decision of whether to pursue criminal corruption charges against Maxwell.

Moreover, when Maxwell made the foregoing statement to the FBI agents, he knew by this time he was a target of the FBI and grand jury investigations of which Chapman was involved. Instead of acknowledging the falsity of the statement when confronted about the recordings, Maxwell "doubled-down" and spun yet another lie about how he had a change of heart and told Doby not to disable Artis's truck. Maxwell's attempt to minimize or explain away his conduct and prior false statement to FBI agents, however, was inconsistent with all of the other evidence at trial, including Doby's testimony and Doby's recorded conversations with him and Thomas, and only served to further demonstrate the lengths he was willing to go to avoid prosecution. The court, therefore, finds

that Maxwell made the statement regarding the A & T truck and his relationship with Doby, even though he knew it was false, to mislead or deceive Chapman, the FBI, and the grand jury, and avoid being indicted and prosecuted for violating federal criminal law. Accordingly, the court determines that the Government has established beyond a reasonable doubt the essential elements necessary for a conviction against Maxwell under section 1001(a) as charged in Count Three of the Indictment.

## III.   Conclusion

For the reasons explained, the court **concludes** that the Government established beyond a reasonable doubt all necessary elements for the offenses charged in Counts One, Two, and Three of the Indictment. Accordingly, the court **finds** Defendant Marcus Maxwell **guilty** of all offenses charged in the Indictment for violations of 18 U.S.C. §§ 1503 and 1001(a)(2). A scheduling order for sentencing will issue by separate order.

Further, the court **denies as moot** the Government's Motion in Limine (Doc. 33) and Defendant Marcus Maxwell's Motion in Limine (Doc. 38). Most of the matters raised in these motions were mooted as a result of Defendant's decision to waive his right to a jury trial and were not considered by the court in deciding Defendant's guilt. Additionally, Defendant's objection to the Government's evidence of audio recordings and transcripts of the recordings was later withdrawn after the Government laid the requisite predicate for admission of this evidence.

**It is so ordered** this 17th day of October, 2018.

*Sam A. Lindsay*
Sam A. Lindsay
United States District Judge